AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
(212) 872-1000 (Telephone)
(212) 872-1002 (Facsimile)
Ira S. Dizengoff
Arik Preis

1700 Pacific Avenue, Suite 4100
Dallas, Texas 75201
(214) 969-2800 (Telephone)
(214) 969-4343 (Facsimile)
Sarah Link Schultz

*Counsel to the Other TSC Debtors and*
*Proposed Counsel to the February Debtors*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| TERRESTAR CORPORATION, *et al.*,[1] | Case No. 11-10612 (SHL) |
| Debtors. | Joint Administration Requested |

**MOTION OF THE FEBRUARY DEBTORS**
**AND THE GUARANTOR FOR ORDER (A) AUTHORIZING**
**THE FEBRUARY DEBTORS TO OBTAIN POSTPETITION FINANCING AND**
**(B) AUTHORIZING THE FEBRUARY DEBTORS TO USE CASH COLLATERAL**

TerreStar Corporation ("*TSC*"), TerreStar Holdings Inc. ("*TS Holdings*") and Motient

Ventures Holding Inc. (the "*Guarantor*"), seek the entry of a final order (the "*Order*"),

substantially in the form attached hereto as Exhibit A (as described in more detail below)

authorizing the February Debtors and the Guarantor to enter into that certain debtor in possession

---

[1] The debtors in these chapter 11 cases, along with the last four digits of each debtor's federal taxpayer-identification number, are: (a) TerreStar Corporation [6127]; and TerreStar Holdings Inc. [0778] (collectively, the "*February Debtors*") and (b) TerreStar New York Inc. [6394]; Motient Communications Inc. [3833]; Motient Holdings Inc. [6634]; Motient License Inc. [2431]; Motient Services Inc. [5106]; Motient Ventures Holding Inc. [6191]; MVH Holdings Inc. [9756] (collectively, the "*Other TSC Debtors*" and collectively, with the February Debtors, the "*TSC Debtors*").

financing evidenced by that certain DIP & Confirmation Financing Commitment (the *"Commitment Letter"*) and to pay certain fees and expenses associated with such financing. In support of this motion, the February Debtors and the Guarantor respectfully state as follows:

## I.    RELIEF REQUESTED

1.    By this motion (the *"DIP Motion"*), the February Debtors and the Guarantor request entry of the Order, pursuant to sections 105, 361, 362, 363, 364(c)(1), 364(c)(2), 364(c)(3), 364(e) and 507 of title 11 of the United States Code (the *"Bankruptcy Code"*), Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the *"Bankruptcy Rules"*) and Rule 4001-2 of the Local Rules for the United States Bankruptcy Court for the Southern District of New York (the *"Local Rules"* or *"LBR"*):

(a)    authorizing the February Debtors to obtain a $13,368,421.05 secured post-petition financing (the *"DIP Financing"* and the loans thereunder, the *"DIP Loans"*) pursuant to a debtor in possession financing agreement (the *"DIP Agreement"*)[2] by and among the February Debtors as borrowers, the Guarantor, Solus Alternative Asset Management LP (including the permitted assigns of its commitment, the *"DIP Lender"*) as lender and NexBank, SSB as agent (the *"DIP Agent"*), incorporating the terms and conditions substantially similar to those contained in the Commitment Letter attached hereto as <u>Exhibit B</u>;

(b)    authorizing the February Debtors and the Guarantor to execute and deliver the DIP Agreement and other related loan documents (collectively with all documents comprising the DIP Financing, the *"DIP Documents"* and the obligations thereunder, the *"DIP Obligations"*) and to perform such other acts as the DIP Agent or the DIP Lender determine may reasonably be necessary or desirable in connection with the DIP Documents;

(c)    authorizing the February Debtors' use of the proceeds of the DIP Loans and cash collateral (as defined in Bankruptcy Code section 363(a), *"Cash Collateral"*) to (i) pay fees and expenses associated with the DIP Financing, (ii) make one or more intercompany loans to certain subsidiaries of TSC, (iii) in accordance with the Budget (defined below), provide for the February Debtors' ongoing

---

[2] As discussed in greater detail herein, the February Debtors, the Guarantor and the DIP Lender are finalizing the DIP Agreement. The DIP Agreement will be in a form consistent with the terms set forth in the Commitment Letter and the Outline of Terms and Conditions attached thereto.

working capital requirements, *provided*, *however*, that amounts included in the Carve-Out (defined below) shall not be subject to the Budget and (iv) make payments and settlements of pre-petition claims;

(d) pursuant to Bankruptcy Code section 364(c)(1), granting to the DIP Agent, for the benefit of the DIP Lender, allowed senior administrative expense claims (the ***"Superpriority Claims"***) for the DIP Obligations which shall, except to the extent expressly set forth in the Order in respect of the Carve-Out (defined below), have priority over any and all administrative expenses, adequate protection claims and all other claims against the February Debtors, now existing or hereafter arising, of any kind whatsoever, including without limitation, all administrative expenses of the kind specified in Bankruptcy Code sections 503(b) and 507(b);

(e) granting to the DIP Agent, for the benefit of the DIP Lender, the following security interests and liens on substantially all of the assets of the February Debtors (all property identified in clauses (i) through (ii) below being collectively referred to as the ***"DIP Collateral"***), subject only to the Carve-Out (defined below) (all such liens and security interests granted to the DIP Agent, for its benefit and for the benefit of the DIP Lender, pursuant to the Order and the DIP Documents, the ***"DIP Liens"***):

(i) pursuant to Bankruptcy Code section 364(c)(2), a fully perfected first priority security interest in and lien on all assets (tangible, intangible, real, personal and mixed, but subject to certain permitted encumbrances and the exclusion of assets on which the grant of such lien would be prohibited by law) in which the February Debtors have an interest, whether existing on or after the February Petition Date (defined below), that is not subject to valid, perfected, non-avoidable and enforceable liens in existence on or as of the February Petition Date (collectively, and excluding any property that is excluded from the definition of "Collateral" in the DIP Agreement, the ***"Unencumbered Property"***), including, without limitation, accounts, inventory, equipment, capital stock in subsidiaries, investment property, instruments, chattel paper, real estate, leasehold interests, contracts, patents, copyrights, trademarks and other general intangibles and all products and proceeds thereof;

(ii) pursuant to Bankruptcy Code section 364(d)(1), valid binding, continuing, enforceable, fully perfected, priming liens on and security interests in the collateral (the ***"Bridge Loan Collateral"***) under the February Debtors' pre-petition short-term financing (the ***"Bridge Loan"***) and the collateral (the ***"Colbeck Collateral"***) securing the February Debtors' obligations to Colbeck Capital Management, LLC (***"Colbeck"***), which liens shall be senior in all respects to the liens granted in conjunction with the Bridge Loan (the ***"Bridge Loan Liens"***) and Colbeck's liens over the Colbeck Collateral (the ***"Colbeck Liens"***) and

(iii) pursuant to Bankruptcy Code section 364(c)(3), a valid, binding, continuing, enforceable, fully-perfected junior lien on, and security interest in, all tangible and intangible pre-petition and post-petition property in which the February Debtors have an interest, whether now existing or hereafter acquired and all proceeds thereof, that is subject to non-avoidable, valid, enforceable and perfected liens that are senior in priority to the Bridge Loan Liens and the Colbeck Liens (such senior liens being the *"**Prior Liens**"*) in existence on the February Petition Date, which security interest and lien shall be (i) senior to all liens other than the Prior Liens and (ii) subject to the Carve-Out (defined below);

(f) authorizing the February Debtors to pay the principal, interest, fees, expenses and other amounts payable under each of the DIP Documents as they become due, including, without limitation, and the fees and expenses of the DIP Agent, all to the extent provided by and in accordance with the terms of the respective DIP Documents;

(g) authorizing the February Debtors to use the Bridge Loan Collateral (defined below) and the Colbeck Collateral (defined below) and the granting of adequate protection to the lenders under the Bridge Loan (the *"**Bridge Loan Lenders**"*) to protect against any diminution in the value of their respective interests in the Bridge Loan Collateral, including without limitation, any such diminution resulting from the sale, lease or use by the February Debtors (or other decline in value) in the form of the Adequate Protection Lien (defined below), payment of interest under the Bridge Loan at the default rate, 507(b) Claims (defined below), payment of the reasonable fees and expenses of the Bridge Loan Lenders, the right to credit bid and access to certain information and

(h) vacating and modifying the automatic stay imposed by Bankruptcy Code section 362 to the extent necessary to (a) implement and effectuate the terms and provisions of the DIP Documents and the Order and (b) subject to paragraph 8 of the Order, permit the DIP Agent to, upon the occurrence and continuance of an Event of Default (as defined in the Commitment Letter) (i) reduce the amount of or terminate any outstanding commitments under the DIP Agreement, (ii) terminate the DIP Agreement, (iii) charge the default rate of interest on the DIP Loans, (iv) declare the entirety of the DIP Loans to be due and payable and/or (v) subject to the Carve-Out, exercise any and all remedies under applicable law (including the UCC).

## II. CONCISE STATEMENT PURSUANT TO BANKRUPTCY RULE 4001-2[3]

2.    Pursuant to Bankruptcy Rules 4001(b), (c) and (d) and Local Bankruptcy Rule 4001-2, the following is a concise statement and summary of the proposed material terms of the DIP Documents and the Order:

| | |
|---|---|
| **DIP Financing Parties** <br> *Bankruptcy Rule 4001(c)(1)(B)* | **Borrower:** the February Debtors <br> **Guarantor:** Motient Ventures Holding Inc. <br> **DIP Agent:** NexBank, SSB <br> **DIP Lender:** Solus Alternative Asset Management LP |
| **Term Commitments** <br> *Bankruptcy Rule 4001(c)(1)(B), LBR 4001-2(a)(1)* | $13,368,421.05 (plus fees and other amounts to be capitalized in accordance with the terms of the DIP Agreement and related documents multiple draw term loan facility. (Order at ¶ 5; Commitment Letter at Exhibit A p. 1; Amendment No. 5 to the Bridge Loan at ¶ 5). |
| **Maturity** <br> *Bankruptcy Rule 4001(c)(1)(B)* | The earliest of: (i) twelve (12) months from the DIP Facility Closing Date (as defined in the Commitment Letter), (ii) the closing of a sale of all or substantially all of the assets of the February Debtors and TerreStar 1.4 Holdings LLC (*"TerreStar 1.4"*), (iii) the conversion of the February Debtors' chapter 11 cases into a liquidation proceeding pursuant to chapter 7 of the Bankruptcy Code, (iv) the acceleration of all obligations under DIP Financing after the occurrence of an event of default and (v) the effective date of the February Debtors' plan of reorganization. (Commitment Letter at Exhibit A pp. 1-2). |
| **Limits on Use of the Term Facility** <br> *Bankruptcy Rule 4001(c)(1)(B), LBR 4001-2(a)(9)* | The proceeds of the DIP Financing shall be used by the February Debtors solely to: (i) pay fees and expenses associated with the DIP Financing, (ii) make one or more intercompany loans to certain subsidiaries of TSC in an aggregate amount not to exceed $100,000 or such higher amount with the consent of the Requisite Lenders (as defined in the Commitment Letter), (iii) in accordance with the Budget, provide for the February Debtors' ongoing working capital requirements and (iv) make payments and settlements of pre-petition claims, subject to the reasonable consent of the Requisite Lenders. Notwithstanding the foregoing (A) in the absence of a continuing event of default, the proceeds of the DIP Financing may be used to pay all professional fees incurred by the February Debtors and by any statutory committee and (B) after the occurrence and during the continuance of an event of default, the proceeds of the DIP Financing may be used to pay the unpaid professional fees that have been incurred prior to the occurrence of such event of default and approved by the Bankruptcy Court plus $800,000 in the aggregate for any professional fees incurred after the occurrence of any such event of default and approved by the Bankruptcy Court. (Order at ¶ 5; Commitment Letter at Exhibit A pp. 3-4). |
| **Use of Cash Collateral** <br> *Bankruptcy Rule 4001(c)(1)(B), LBR 4001-(2)(a)(9)* | To provide working capital and for other general corporate purposes of the February Debtors, including for payment of any adequate protection obligations. (Order at ¶ 12). |

---

[3] This statement is qualified in its entirety by reference to the provisions of the DIP Agreement, the Commitment Letter and the Order. To the extent of any inconsistency between this concise statement and the Commitment Letter, the Commitment Letter shall govern.

| | |
|---|---|
| **Interest Rate**<br>*Bankruptcy Rule*<br>*4001(c)(1)(B),*<br>*LBR 4001-2(a)(3)* | **Interest Rate:** 12.5% per annum payable in cash and monthly in arrears.<br>**Default Interest Rate:** The rate that would otherwise be applicable plus 2% per annum.<br>(Commitment Letter at Exhibit A pp. 2-3). |
| **Fees**<br>*Bankruptcy Rule*<br>*4001(c)(1)(B),*<br>*LBR 4001-2(a)(3)* | **Commitment Fee:** The February Debtors shall pay a commitment fee in an amount equal to 4.0% of the principal amount of the DIP Financing, which fee shall be earned in full and payable in kind upon the initial funding of the DIP Financing.<br>**Administrative Agency Fee:** The February Debtors shall pay an administrative agency fee equal to $15,000, which fee shall be non-refundable and fully earned on the DIP Facility Closing Date (as defined in the Commitment Letter).[4] (Commitment Letter at Exhibit A p. 3). |
| **Budget**<br>*Bankruptcy Rule*<br>*4001(c)(1)(B)* | So long as any commitments remain outstanding under the DIP Financing, the February Debtors must operate within the Budget; provided, however, that certain line items in the Budget including estate retained professionals, shall not be subject to this requirement. (Order at ¶ 5; Commitment Letter at Exhibit A pp. 3-4). |
| **Milestone Requirements**<br>*Bankruptcy Rule*<br>*4001(c)(1)(B)(v)-(vii)* | The February Debtors shall meet the following deadlines for the plan confirmation process: on or prior to November 30, 2011, entry of an order by the Court confirming a plan of reorganization of the February Debtors containing treatment of claims and release provisions that are reasonably acceptable to the Requisite Lenders and providing that the February Debtors will work in good faith and consult with the DIP Lender regarding the remaining terms of such plan of reorganization. (Commitment Letter at Exhibit A p. 6). |
| **Covenants**<br>*Bankruptcy Rule*<br>*4001(c)(1)(B),*<br>*LBR 4001-2(a)(8)* | The loan documentation will contain affirmative, negative and reporting covenants customary for financings of this type and other covenants appropriate to this specific transaction as agreed to by the February Debtors and the DIP Lender, including, without limitation, the following:<br><br>**Covenants:** Covenants regarding provision of financial statements, notices of litigation, defaults and unmatured defaults and other information (including pleadings, motions, applications, and other documents filed with the Court or distributed to any official committee appointed in the February Debtors' chapter 11 cases), compliance with permits, licenses (including FCC permits, licenses and approvals) and laws (including, without limitation, ERISA and environmental laws), inspection of properties, books and records, maintenance of insurance, limitations with respect to liens and encumbrances (including, without limitation, a prohibition on pledging or encumbering membership units of TerreStar 1.4), dividends and retirement of capital stock (other than the cash payment to holders of preferred stock of TSC upon the effective date of the February Debtors' plan of reorganization), guarantees, sale and lease back transactions, consolidations and mergers, investments, capital expenditures, loans and advances, indebtedness, transactions with affiliates, prepayment of other indebtedness and amendments to material agreements, in each case subject to certain exceptions to be agreed upon.<br><br>**Financial Reporting:** Among other things, the documents evidencing the DIP Loan will provide for the following financial reporting: (i) annual, audited financial statements, (ii) quarterly, internally prepared, financial statements, (iii) monthly, internally prepared, financial statements, (iv) delivery of updated Budgets, (v) delivery of monthly compliance certificates, including a reconciliation of actual results for the immediately preceding month to the budged amounts for such month and a detail explanation of the all variances, (vi) annual projections, including monthly balance sheet, profit and loss and cash flow figures and (vii) other reporting as reasonably required by the Requisite Lenders. (Commitment Letter at Exhibit A pp. 5-6). |

---

[4] The administrative agency fee is slightly higher than the fee originally contemplated in the Commitment Letter.

| | |
|---|---|
| **Liens and Priorities**<br>*Bankruptcy Rule*<br>*4001(c)(1)(B),*<br>*LBR 4001-2(a)(4)* | **Liens:** The February Debtors grant the following as collateral securing all DIP Financing obligations, subject to the Carve-Out:<br><br>**Liens on DIP Collateral:** (i) Pursuant to section 364(c)(2), a fully perfected first priority security interest in and lien on the Unencumbered Property; (ii) pursuant to section 364(d)(1), a fully perfected first priority security interests in and priming liens on the Bridge Loan Collateral and Colbeck Collateral and (iii) pursuant to Bankruptcy Code section 364(c)(3), junior liens on property secured by Prior Liens, subject to the Carve-Out. (Order at ¶ 7)<br><br>**Future Property:** The DIP Collateral includes all property and assets of the February Debtors and their estates, real and personal, tangible and intangible, including all causes of action (subject to the limitation noted below and the exclusion of assets on which the grant of such lien would be prohibited by law), whether owned as of the February Petition Date or after acquired or arising, and regardless of where located or by whomsoever held, and whether now owned or in which the February Debtors have any interest or hereafter acquired or in which the February Debtors obtain an interest. (Order at ¶ 7).<br><br>**Avoidance Actions:** The DIP Collateral shall include the proceeds of any of the February Debtors' claims and causes of action arising under Bankruptcy Code sections 542-553 (collectively, the *"Avoidance Actions"*). This constitutes an "extraordinary provision" (a *"Material Provision"*) under General Order M-274 of the United States Bankruptcy Court for the Southern District of New York. (Order at ¶ 7; Commitment Letter at Exhibit A p. 2).<br><br>**Priorities:** Pursuant to Bankruptcy Code section 364(c)(1), obligations under the DIP Financing constitute superpriority administrative expenses in the February Debtors' chapter 11 cases. (Order at ¶ 6). |
| **Carve-Out**<br>*LBR 4001-2(a)(5),*<br>*4001-2(d)* | The *"Carve-Out"* applies to: (i) all fees required to be paid to the Clerk of the Bankruptcy Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code; (ii) allowed professional fees and expenses incurred by the February Debtors or a statutory committee (if any), subject to entry of a customary order of the Court and (iii) after the occurrence and during the continuance of an Event of Default under the DIP Documents, the payment of allowed professional fees and expenses incurred by the February Debtors or a statutory committee after the occurrence of the Event of Default in an aggregate amount not in excess of $800,000 (plus all unpaid professional fees and expenses allowed by this Court that were incurred prior to the occurrence of such Event of Default); *provided that* (Y) so long as no Event of Default shall have occurred and be continuing, the Carve-Out shall not be reduced by the payment of fees and expenses allowed by this Court under Bankruptcy Code sections 328, 330 and 331 and (Z) nothing in the Order shall impair the right of any party to object to the reasonableness of any such fees or expenses to be paid by the February Debtors' estates. (Order at ¶ 6). |
| **Adequate Protection**<br>**for Pre-petition**<br>**Lenders**<br>*Bankruptcy Rules*<br>*4001(b)(1)(B)(iv) and*<br>*4001(c)(1)(B)(ii),*<br>*LBR 4001 2(a)(4)* | As described in more detail below, the interests of the holders of the Prior Liens, if any, the Bridge Loan Lenders and Colbeck are adequately protected as the value of the February Debtors' assets greatly exceeds the amount of secured debt encumbering such assets. As further adequate protection, the Bridge Loan Lenders will be granted an Adequate Protection Lien (defined below), payment of interest on the Bridge Loan at the default rate, 507(b) Claims (defined below), payment of the reasonable fees and expenses of the Bridge Loan Lenders, the right to credit bid and access to certain information. (Order at ¶ 13). |
| **Events of Default**<br>*Bankruptcy Rule*<br>*4001(c)(1)(B),*<br>*LBR 4001-2(a)(10)* | The DIP Agreement will contain usual and customary events of default, including, but not limited to, payment, cross-default, violation of covenants, breach of representations or warranties, bankruptcy or insolvency (with respect to TerreStar 1.4), judgment, ERISA, environmental, material adverse deviation from the Budget subject to such line items (excluding, among other things, the professional fees and expenses incurred by the Borrowers and by any official committees approved by the Court in the February Debtors' chapter 11 cases and the fees |

| | |
|---|---|
| | pursuant to 28 U.S.C. § 1930) and variances in the Budget to be agreed upon, change of control, termination or a breach of the Spectrum Lease Agreement (as defined in the Commitment Letter), or the loss or revocation of any FCC license with respect to TerreStar 1.4's ability to operate the 1.4GHz spectrum.<br><br>In addition, an event of default shall occur if: (i) any of the February Debtors' chapter 11 cases shall be dismissed or converted to a chapter 7 case; a chapter 11 trustee or an examiner with enlarged powers shall be appointed; any other superpriority administrative expense claim which is senior to or *pari passu* with the DIP Agent's claims shall be granted; the Order shall be stayed, amended, modified, reversed or vacated; the February Debtors' plan of reorganization shall be confirmed in any of the February Debtors' chapter 11 cases which does not provide for payment in full in cash of the February Debtors' obligations thereunder on the effective date of the February Debtors' plan of reorganization or an order shall be entered which dismisses any of the February Debtors' chapter 11 cases and which order does not provide for termination of the DIP Financing and payment in full in cash of all obligations thereunder or the February Debtors shall take any action, including the filing of an application, in support of any of the foregoing or any person other than the February Debtors shall do so and such application is not contested in good faith by the February Debtors and the relief requested is granted in an order that is not stayed pending appeal or (ii) the Court shall enter an order granting relief from the automatic stay to the holder of any security interest in any asset of the February Debtors having a book value in an amount to be determined. (Commitment Letter at Exhibit A pp. 6-7). |
| **Waiver or Modification of the Automatic Stay** *Bankruptcy Rule 4001(c)(1)(B) LBR 4001-2(a)(10)* | The automatic stay is vacated to permit the exercise of remedies by the DIP Lender and/or the DIP Agent; provided, that the DIP Lender and/or DIP Agent may only exercise rights and remedies against DIP Collateral upon the provision of five (5) business days' prior notice to the February Debtors and certain other parties. (Order at ¶ 8). |
| **Waivers/Modification Regarding Perfection or Enforcement of a Lien** *Bankruptcy Rule 4001(c)(1)(B)(viii)* | The Order is effective to create in favor of the DIP Lender legal, valid, enforceable and fully perfected security interests in and liens on the DIP Collateral. (Order at ¶ 7). |
| **Change of Control** *LBR 4001-2(a)(11)* | The occurrence of a change of control constitutes an event of default under the DIP Financing. (Commitment Letter at Exhibit A pp. 6-7). |
| **Joint Liability** *LBR 4001-2(a)(14), 4001-2(e)* | The February Debtors are the borrowers and the Guarantor is the guarantor under the DIP Financing. Additionally, the liens and superpriority claims granted under the DIP Financing apply to the estate of each of the February Debtors in these chapter 11 cases. (Commitment Letter at Exhibit A p. 1). |
| **Funding of Non-Debtor Affiliates** *LBR 4001-2(a)(15)* | The proceeds of the DIP Financing may be used to make one or more intercompany loans to certain subsidiaries of TSC in an aggregate amount not to exceed $100,000 or such higher amount with the consent of the Requisite Lenders. (Commitment Letter at Exhibit A p. 3). |
| **Indemnification** *Bankruptcy Rule 4001(c)(1)(B)(ix)* | The February Debtors shall indemnify the DIP Lender and its affiliates and each of their assignees, and each of their directors, officers, employees and agents pursuant to customary indemnification provisions. (Commitment Letter at 2). |

| | |
|---|---|
| **Conditions to Closing and Initial Borrowing** *Bankruptcy Rule 4001(c)(1)(B), LBR 4001-2(a)(2) and 4001-2(h)* | The DIP Agreement contains conditions precedent to the DIP Lender's obligations under the DIP Financing. (Order at ¶ 5; Commitment Letter at Exhibit A pp. 4-5). |

3.      As set forth herein, these provisions were thoroughly negotiated and are necessary for the February Debtors to effectuate the DIP Financing and procure the financing made available under the DIP Financing in a sufficient amount and on a timely basis.

## III.     PRELIMINARY STATEMENT

4.      By this motion, the February Debtors and the Guarantor are seeking authority to enter into a debtor in possession financing facility in the amount of $13,368,421.05, under which the February Debtors will be the borrowers and which will be guaranteed by the Guarantor, one of the Other TSC Debtors. The DIP Financing will provide the necessary financing required for the continued viability of the February Debtors and the success of the February Debtors' reorganization efforts.

5.      As of the February Petition Date, the February Debtors had cash on hand of less than $100,000. Absent access to the proposed DIP Financing, the February Debtors will not be able to safeguard their assets for more than a brief period during these chapter 11 cases and will be forced to liquidate assets to the detriment of all parties in interest in these chapter 11 cases. Approval of the DIP Financing will allow the February Debtors to, among other things, preserve their assets and complete a successful reorganization.

6.      As discussed in more detail below (as well as in the various declarations filed in connection herewith), the February Debtors' decision to enter into the proposed DIP Financing is the culmination of an intense, several month process targeted at procuring DIP Financing that

was coupled with a concomitant exit strategy in a situation where the February Debtors needed one.

## IV.  BACKGROUND

7.  On October 19, 2010 (the "*October Petition Date*"), each of the Other TSC Debtors, together with TerreStar Networks Inc. ("*TSN*") and certain of its affiliates (collectively with TSN, the "*TSN Debtors*" and, together with the Other TSC Debtors, the "*October Debtors*") filed a petition with this Court under chapter 11 of the Bankruptcy Code.  On February 16, 2011 (the "*February Petition Date*" and together with the October Petition Date, the "*Petition Date*"), each of the February Debtors filed a petition with this Court under chapter 11 of the Bankruptcy Code.  The February Debtors are operating their business and managing their property as debtors in possession pursuant to Bankruptcy Code sections 1107(a) and 1108. No request for the appointment of a trustee or examiner has been made in these chapter 11 cases.

8.  On October 20, 2010, the Court entered an order providing for the joint administration of the Other TSC Debtors' cases for procedural purposes under the case of TSN. Contemporaneous with the filing of the petitions for the February Debtors, the Other TSC Debtors requested that their cases be de-consolidated form the case of TSN, and the TSC Debtors sought procedural consolidation and joint administration of the chapter 11 cases of the Other TSC Debtors and the February Debtors under the case of TSC.

9.  On October 29, 2010, the United States Trustee for the Southern District of New York (the "*U.S. Trustee*") appointed an official committee of unsecured creditors (the "*Committee*") of the October Debtors.  No statutory committees have been appointed or designated in the February Debtors' cases.

10.  A detailed description of the TSC Debtors' business and the reasons for filing these chapter 11 cases is set forth in the Declaration of Jeffrey W. Epstein Pursuant to Local

Bankruptcy Rule 1007-2 in Support of First Day Pleadings (the "***First Day Declaration***"), which was filed on the February Petition Date.

## V. JURISDICTION AND VENUE

11.     This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## VI. OUTSTANDING PRE-PETITION INDEBTEDNESS

12.     As of the February Petition Date, the instruments evidencing the February Debtors' significant indebtedness are as described below:

| Name of Facility | Borrower/ Issuer/ Guarantor | Secured or Unsecured | Date Issued / Name of Trustee or Agent | Amount Outstanding as of the February Petition Date |
|---|---|---|---|---|
| Term Loan Credit Agreement (the "***Bridge Loan***") | **Borrowers:** the February Debtors **Administrative Agent:** NexBank, SSB (the "***Bridge Loan Agent***") | Secured | November 19, 2010 | $4,308,262.98 |
| Promissory Note | **Obligor:** TSC and TS Holdings **Lender:** Colbeck | Secured | January 28, 2011 | $125,000 |
| Promissory Note | **Obligor:** TSC and TS Holdings **Lender:** Colbeck | Secured | February 2, 2011 | $750,000 |

## VII. DEBTORS' PROPOSED DIP FINANCING

### A. Need for Post-petition Financing

13.     As described more fully in the First Day Declaration and the Declaration of Steven W. Zelin in Support of the DIP Motion (the "***Zelin Declaration***"), attached hereto as Exhibit C, the February Debtors currently do not generate sufficient cash to cover their expenses and require additional funds. *See* First Day Declaration at ¶ 30; Zelin Declaration at ¶ 6.

14.     The February Debtors have, with the assistance of their financial advisors, Blackstone Advisory Partners L.P. (***"Blackstone"***), analyzed their cash needs in an effort to

determine what is necessary to maintain their business in chapter 11 and work towards a successful reorganization. In undertaking this analysis, the February Debtors and their advisors have considered the impact of the current economic outlook on the February Debtors' near term projected financial performance. The February Debtors also conferred with individuals in the February Debtors' management team to understand key business metrics in both the near and long term. *See* Zelin Declaration at ¶ 9.

15.    As part of the February Debtors' recent financial analysis and projections, the February Debtors developed a 13-week cash flow forecast, which takes into account anticipated cash receipts and disbursements during that time. This forecast considers a number of factors, including, among others, the impact of a bankruptcy filing, material cash disbursements and cash flows. *See* Zelin Declaration at ¶ 9.

16.    Absent approval of the DIP Financing and the February Debtors' use of Cash Collateral, the February Debtors' financial analysis and projections make clear that the February Debtors' current cash on hand and minimal cash generated will be insufficient to, among other things, preserve the February Debtors' assets during the pendency of these chapter 11 cases. Without access to the DIP Financing and the use of Cash Collateral, the February Debtors will soon have *no* cash available to maintain their business and make the necessary expenditures that are critical to their success. As such, the February Debtors would be forced to curtail or even terminate their business to the material detriment of all parties in interest in these chapter 11 cases. · Thus, the February Debtors need to ensure that working capital is available now. *See* First Day Declaration at ¶ 42; Zelin Declaration at ¶ 10.

B.    **The February Debtors' Efforts to Obtain Post-petition Financing**

17.    Up until a few days before the October Petition Date, and as set forth in more detail in the First Day Declaration, the February Debtors had contemplated filing for chapter 11

at the same time as the Other TSC Debtors. However, certain of the largest preferred shareholders (the *"Preferred Shareholders"*) of TSC's preferred stock requested that the February Debtors refrain from filing for chapter 11 while they worked with the February Debtors on the terms of a consensual restructuring.

18.     As part of the consensual negotiations, the Preferred Shareholders agreed to provide the February Debtors with the Bridge Loan in the original principal amount of $2.65 million while the parties determined if a consensual restructuring could be achieved, and Highland Capital Management, L.P. agreed to toll certain litigation outstanding against TSC. As such, and as an accommodation to the above-mentioned Preferred Shareholders, the February Debtors delayed a chapter 11 filing to pursue a consensual restructuring.

19.     Despite the best efforts of all parties, the February Debtors and the Preferred Shareholders were unable to reach agreement reasonably satisfactory to the February Debtors regarding post-petition financing. When it became apparent that the TSC Debtors and the Bridge Lenders were unlikely to reach agreement regarding a potential debtor-in-possession facility and the TSC Debtors were nearly out of cash, consistent with their fiduciary duties, the TSC Debtors canvassed the market for third-party debtor-in-possession financing and signed a commitment letter with the third-party lender. Prior to consummating the third-party debtor in possession financing, one of the Bridge Lenders/Preferred Shareholders offered a debtor in possession financing facility with more favorable terms than those offered by the third-party. Specifically, the proposed DIP Financing has a lower rate of interest, provides for multiple draws and does not have any prepayment penalties. Accordingly, on February 2, 2011, the February Debtors executed the Commitment Letter. Importantly, in addition to providing the February Debtors with debtor in possession financing, the Commitment Letter provides that the DIP Financing

may be rolled into an exit facility, paving the way for a successful restructuring, the terms of which will be set forth in the joint chapter 11 plan of reorganization of the February Debtors and related disclosure statement, which the February Debtors intend to file shortly.

20.     Shortly after the Commitment Letter was executed, it became apparent that additional funds would be needed to allow the February Debtors to revise pleadings and proceed with the debtor in possession facility contemplated by the Commitment Letter. Accordingly, on February 4, 2011, the Bridge Loan was amended to provide for an additional borrowing of $1,631,578.95. In connection with the amendment to the Bridge Loan, the parties agreed to reduce the amount committed under the Commitment Letter by $1,631,578.95.

21.     Prior to and during the consensual negotiations, the February Debtors and their advisors analyzed and marketed various DIP financing structures, evaluated the February Debtors' need for financing (i.e., amount, type, etc.) and carefully weighed the effect that the February Debtors' pre-petition capital structure would have on both its ability to attain DIP financing as well as ultimately exit from chapter 11. In exploring all of its options, the February Debtors recognized that substantially all of the February Debtors' assets served as security for the Bridge Loan, such that either (i) the liens securing the Bridge Loan would have to be "primed" to obtain post-petition financing, (ii) the February Debtors would have to find a post-petition lender willing to extend credit to pay off the Bridge Loan or (iii) the February Debtors would have to find a post-petition lender willing to extend credit on a junior basis, all while considering that the existing Preferred Shareholders were the likely providers of post-petition financing.

22.     In light of the above, and after thoroughly considering all other options, the February Debtors determined that the proposal by the DIP Lender, which, upon information and

belief, provided for the consensual priming of the Bridge Loan Liens, was in the best interests of the February Debtors and all of their stakeholders. Specifically, the February Debtors concluded that the DIP Financing proposal that is the subject of this DIP Motion was superior to all other options because it eliminates the risk of a "priming" fight with the Bridge Loan Lenders and provides the February Debtors with the financing necessary to continue their business during these chapter 11 cases. The February Debtors believe that their decision to pursue this restructuring plan will be beneficial to their estates and will ensure a swift exit from these bankruptcy proceedings.

23. Based on these factors, and in light of the fair and thorough negotiation process undertaken by the February Debtors, the DIP Financing is the only feasible post-petition financing option for the February Debtors and is in the best interests of the February Debtors' estates.

## C.    Implementation of the DIP Agreement

24. The DIP Agreement will allow the February Debtors to draw on a $13,368,421.05 commitment from the DIP Lender. This commitment should allow the February Debtors to meet all of their administrative obligations during these chapter 11 cases while at the same time making the necessary expenditures that are critical to the February Debtors' future success as a business.

25. The February Debtors and the DIP Lender have agreed upon a budget (the "*Budget*") for the thirteen-week period following the commencement of the DIP Financing. The February Debtors believe that the Budget is achievable and will allow the February Debtors to operate without the accrual of unpaid administrative expenses. *See* Zelin Declaration at ¶ 11.

# VIII.  SUPPORTING AUTHORITY

26.      The continued viability of the February Debtors' business and the success of the February Debtors' reorganization efforts hinge upon obtaining access to financing.  Absent access to financing, the February Debtors will not be able to maintain their business for the duration of these chapter 11 cases.  At this time, the February Debtors request authorization to borrow $13,368,421.05 (plus all fees, interest and other amounts to be capitalized pursuant to the DIP Agreement and related documents) under the terms consistent with those outlined in the Commitment Letter and to use such proceeds to maintain their business during the pendency of these chapter 11 cases.

27.      As set forth in detail above, the DIP Financing is the best financing available to the February Debtors at this time.  The February Debtors have been unable to procure sufficient financing:    (a) in  the  form  of  unsecured  credit  allowable  under  Bankruptcy  Code section 503(b)(l);  (b) solely  as  an  administrative  expense  under  Bankruptcy  Code sections 364(a)-(b) or (c) in exchange solely for the grant of a superpriority administrative expense claim pursuant to Bankruptcy Code section 364(c).  Thus, based on the foregoing and for the reasons set forth below, the February Debtors submit that they have satisfied the requirements to access post-petition financing on a superpriority, secured basis pursuant to Bankruptcy Code section 364.

## A.      The February Debtors Should Be Authorized to Obtain Post-petition Financing Under Bankruptcy Code Section 364

### (i)      Financing Under Bankruptcy Code Section 364(c) is Appropriate

28.      Pursuant to Bankruptcy Code section 364(c), a court may authorize a debtor to incur debt that is (a) entitled to a superpriority administrative expense status; (b) secured by a lien on otherwise unencumbered property or (c) secured by a junior lien on encumbered property

if the debtor cannot obtain post-petition credit on an unsecured basis, on an administrative

expense priority or secured solely by junior liens on the debtor's assets. *See* 11 U.S.C. § 364(c);[5]

*In re Barbara K. Enters, Inc.*, No. 08-11474 (MG), 2008 WL 2439649, at *8 (Bankr. S.D.N.Y.

June 16, 2008) (in order for a debtor to obtain post-petition secured credit under section 364, the

debtor must prove that it was unable to reasonably obtain secure credit elsewhere); *Pearl-Phil*

*GMT (Far East) Ltd. v. Caldor Corp.*, 266 B.R. 575, 584 (S.D.N.Y. 2001) (superpriority

administrative expenses authorized where debtor could not obtain credit as an administrative

expense).

29. Courts in this jurisdiction and others have fashioned guidelines in applying these

statutory requirements. Generally, courts advocate using a "holistic approach" to evaluate

superpriority post-petition financing agreements, which focuses on the transaction as a whole.

As one court has noted:

> Obtaining credit should be permitted not only because it is not
> available elsewhere, which could suggest the unsoundness of the
> basis for use of the funds generated by credit, but also because the
> credit acquired is of significant benefit to the debtor's estate
> and . . . the terms of the proposed loan are within the bounds of
> reason, irrespective of the inability of the debtor to obtain
> comparable credit elsewhere.

*In re Aqua Assocs.*, 123 B.R. 192, 196 (Bankr. E.D. Pa. 1991); *see also In re YL W. 87th*

*Holdings I LLC*, 423 B.R. 421, 442 (Bankr. S.D.N.Y. 2010).

---

[5] Specifically, Bankruptcy Code section 364(c) provides, in pertinent part, that:

> If the trustee [or debtor in possession] is unable to obtain unsecured credit
> allowable under section 503(b)(1) of this title as an administrative expense, the
> court, after notice and a hearing, may authorize the obtaining of credit or the
> incurring of debt – (1) with priority over any or all administrative expenses of
> the kind specified in section 503(b) or 507(b) of this title; (2) secured by a junior
> lien on property of the estate that is not otherwise subject to a lien; or
> (3) secured by a junior lien on property of the estate that is subject to a lien.

11 U.S.C. § 364(c).

30.     More specifically, in evaluating a debtor's proposed post-petition financing, courts consider whether the post-petition financing: (a) is necessary to preserve the assets of the estate and is necessary, essential and appropriate for continued operation of the debtor's business; (b) is in the best interests of the debtor's creditors and estates; (c) is an exercise of the debtor's sound and reasonable business judgment; (d) was negotiated in good faith and at arm's length between the debtor, on the one hand, and the agents and the lenders on the other and (e) contains terms that are fair, reasonable and adequate given the circumstances of the debtor and the proposed post-petition lender. *See In re Farmland Indus., Inc.*, 294 B.R. 855, 881 (Bankr. W.D. Mo. 2003) *cited in* Tr. of Rec. at 733:3-6, *In re Lyondell Chem. Co.*, No. 09-10023 (Bankr. S.D.N.Y. Feb. 27, 2009)[6]; *see also In re Barbara K. Enters., Inc.*, 2008 WL 2439649 at *10; *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990).

31.     The February Debtors propose to obtain the financing substantially in the form provided for in the Commitment Letter by providing, among other things, superpriority claims, security interests and liens pursuant to Bankruptcy Code sections 364(c)(1)–(3) and Bankruptcy Code section 364(d).  For the reasons set forth below, the February Debtors submit that entry into the DIP Financing satisfies each of these factors.

### (ii)     *The Priming of the Bridge Loan Liens and the Colbeck Liens Under Bankruptcy Code Section 364(d) is Appropriate*

32.     A priming lien can be granted in one of two ways – one, with the consent of the secured creditor who is being primed or two, if the February Debtors are able to show that the requirements of Bankruptcy Code section 364(d) have been satisfied.  Under the DIP Agreement, the DIP Agent, on behalf of the DIP Lenders, is being granted priming liens on, and security

---

[6] Because of the voluminous nature of the orders and transcripts cited herein, they are not attached to the DIP Motion.  Copies of all orders and transcripts cited herein are available on request of the TSC Debtors' counsel.

interests in, the Bridge Loan Collateral and Colbeck Collateral. To be clear, while the DIP Liens on the Bridge Loan Collateral and Colbeck Collateral will prime, and be senior in all respects to, the security interests in, and liens on, the Bridge Loan Collateral and the Colbeck Collateral, they will be junior to any Prior Liens, although the February Debtors do not believe any Prior Liens exist.

33.     On information and belief, the Bridge Loan Lenders have consented to the Bridge Loan Collateral being primed by the DIP Liens. Accordingly, the Debtors submit that no showing under Bankruptcy Code section 364(d) is required and request that the Court approve the grant of the priming liens on the Bridge Loan Collateral.

34.     Bankruptcy Code section 364(d)(1) provides that a court may grant a priming lien if (A) debtor in possession financing cannot be obtained otherwise and (B) there is adequate protection of the interest of the holder of such lien. As explained above, the February Debtors are unable to otherwise obtain financing from an alternative source without priming the existing security interests. Further, the interests of both the Bridge Loan Lenders and Colbeck are adequately protected as the value of the Bridge Loan Collateral and the Colbeck Collateral greatly exceeds the amount of secured debt encumbering such assets. *See* Zelin Declaration at ¶21. Therefore, granting priming liens on the Bridge Loan Collateral and the Colbeck Collateral is appropriate.

**B.      The DIP Financing Was Negotiated in Good Faith and Entry into the DIP Financing Is in the Best Interests of the February Debtors' Creditors and Estates, Is Necessary to Preserve Estate Assets and Is an Exercise of the February Debtors' Sound and Reasonable Business Judgment**

35.     A debtor's decision to enter into a post-petition lending facility under Bankruptcy Code section 364 is governed by the business judgment standard. *See Barbara K. Enters.*, 2008 WL 2439649, at *14 (explaining that courts defer to a debtor's business judgment); *Ames Dep't*

*Stores*, 115 B.R. at 38 (noting that financing decisions under Bankruptcy Code section 364 must reflect a debtor's business judgment). Courts grant a debtor considerable deference in acting in accordance with its sound business judgment. *See, e.g., Barbara K. Enters.*, 2008 WL 2439649, at *14 (explaining that courts defer to a debtor's business judgment "so long as a request for financing does not 'leverage the bankruptcy process' and unfairly cede control of the reorganization to one party in interest."); *Trans World Airlines, Inc. v. Travellers Int'l AG (In re Trans World Airlines, Inc.)*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (approving post-petition loan and receivables facility because such facility "reflect[ed] sound and prudent business judgment"); *In re Simasko Prod. Co.*, 47 B.R. 444, 449 (Bankr. D. Colo. 1985) ("[D]iscretion to act with regard to business planning activities is at the heart of the debtor's power.") (citations omitted).

36.    Specifically, to determine whether the business judgment standard is met, a court is "'required to examine whether a reasonable business person would make a similar decision under similar circumstances.'" *In re Dura Auto. Sys., Inc.*, No. 06-11202 (KJC), 2007 Bankr. LEXIS 2764, at *272 (Bankr. D. Del, Aug. 15, 2007) (quoting *In re Exide Techs.*, 340 B.R. 222, 239 (Bankr. D. Del. 2006)); *In re Brooklyn Hosp. Ctr. and Caledonian Health Ctr., Inc.*, 341 B.R. 405, 410 (Bankr. E.D.N.Y. 2006) (the business judgment rule "'is a presumption that in making a business decision, the directors of a corporation acted on an informed basis, in good faith, and in the honest belief that the action taken was in the best interests of the company'") *quoting Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 656 (S.D.N.Y. 1992); *see also In re Curlew Valley Assocs.*, 14 B.R. 506, 513-14 (Bankr. D. Utah 1981) (noting that courts should not second guess a debtor's business decision when that decision involves "a business judgment made in good faith, upon a

reasonable basis, and within the scope of [the debtor's] authority under the [Bankruptcy] Code.")
(citation omitted).

37.    Furthermore, in determining whether the February Debtors and the Guarantor have exercised sound business judgment in deciding to enter into the DIP Documents, the Court should consider the economic terms of the DIP Financing in light of current market conditions. *See, e.g.,* Tr. of Rec., 734-35:24, *In re Lyondell Chem. Co.*, Case No. 09-10023 (Bankr. S.D.N.Y. Feb. 27, 2009) (recognizing "the terms that are now available for DIP financings in the current economic environment aren't as desirable" as in the past).  Moreover, it is appropriate for the Court to consider non-economic benefits to the February Debtors and the Guarantor offered by a proposed post-petition financing facility.  For example, in *In re ION Media Networks, Inc.*, the Bankruptcy Court for the Southern District of New York held that:

> Although all parties . . . are naturally motivated to obtain financing on the best possible terms, the business decision to obtain credit from a particular lender is almost never based purely on economic terms.    Relevant features of the financing must be evaluated, including non-economic factors. . . . This is particularly true in a bankruptcy setting where cooperation and established alliances with creditor groups can be a vital part of building support for a restructuring that ultimately may lead to a confirmable plan of reorganization. That which helps foster consensus may be preferable to a notionally better transaction that carries the risk of promoting unwanted conflict.

Case No. 09-13125 (Bankr. S.D.N.Y. July 6, 2009).

38.    The February Debtors' and the Guarantor's decision to enter into the proposed DIP Agreement is an exercise of their sound business judgment that warrants approval by the Court.  As described in more detail above, the February Debtors' and the Guarantor's decision to enter into the DIP Agreement is the culmination of an intense, several month process targeted at procuring the best available financing under the circumstances.  The February Debtors and the Guarantor negotiated the DIP Documents with the DIP Lender in good faith, at arm's length and

with the assistance of outside advisors to obtain the required post-petition financing on the most favorable terms possible to the February Debtors and the Guarantor. Moreover, entry into the DIP Agreement with the DIP Lender is part of a comprehensive global restructuring plan that will facilitate the February Debtors' exit from bankruptcy.

39.     Based on the advice of counsel and the February Debtors' the Guarantor's other advisors, and the February Debtors' and the Guarantor's own analysis, the February Debtors and the Guarantor have determined in their sound business judgment that the DIP Financing provides financing on more favorable terms than any other reasonably available alternative.

40.     Moreover, entry into the DIP Agreement and securing financing thereunder is absolutely necessary to the preservation of estate assets and is in the best interest of the February Debtors' creditors and all parties in interest; therefore, entry into the DIP Agreement is an exercise of the February Debtors' sound business judgment. Given the February Debtors' significantly constrained liquidity, the DIP Financing is of critical importance to preserving the February Debtors' going concern value.

41.     The February Debtors have an urgent need to obtain access to the DIP Financing to, among other things, provide sufficient funds for the February Debtors to negotiate the chapter 11 process – which is vital to preserving and maintaining the February Debtors' assets. The inability to meet these needs would impair, if not destroy, the February Debtors' prospects for reorganization. In short, without access to the liquidity provided by the DIP Financing, the February Debtors would be forced to liquidate their assets to the detriment of all parties in interest in these chapter 11 cases.

42.     Additionally, the February Debtors' access to the DIP Financing will ensure that the value of their assets is preserved, thereby providing a greater recovery to the February

Debtors' creditors than would be realized if the February Debtors were forced to engage in a fire sale liquidation of their assets. Accordingly, the February Debtors submit that the availability of credit under the DIP Financing is necessary to preserve and enhance the value of their estates for the benefit of all stakeholders in these chapter 11 cases.

43. For these reasons, the February Debtors and the Guarantor submit that the terms of the DIP Financing were negotiated in good faith and that entry into the DIP Agreement is in the best interests of the February Debtors' creditors, is necessary to preserve the value of estate assets and is an exercise of the February Debtors' and the Guarantor's sound and reasonable business judgment.

## C. The DIP Financing is the Best Source of Funding Available to the February Debtors

44. It is well recognized in this jurisdiction and others that the appropriateness of a proposed post-petition financing facility must be considered in light of current market conditions. *See, e.g.,* Tr. of Rec. at 734-35:24, *In re Lyondell Chem. Co.,* Case No. 09-10023 (Bankr. S.D.N.Y. Feb. 27, 2009); *Bray v. Shenandoah Fed. Savs. & Loan Assoc. (In re Snowshoe Co. Inc.),* 789 F.2d 1085, 1088 (4th Cir. 1986) (noting that a debtor is not required to seek credit from every possible lender before determining such credit is unavailable). Indeed, courts often recognize that where there are few lenders likely able and willing to extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [a debtor] to conduct such an exhaustive search for financing." *In re Sky Valley, Inc.,* 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd,* 99 B.R. 117 (N.D. Ga. 1989); *see also In re 495 Cent. Park Ave. Corp.,* 136 B.R. 626, 630 (Bankr. S.D.N.Y. 1992) (the Bankruptcy Code "does not require the debtor to seek alternate financing from every possible lender"). This is especially true when time is of the essence. *See In re Reading Tube Indus.,* 72 B.R. 329, 332 (Bankr. E.D. Pa. 1987). Rather, a debtor must demonstrate that it made a reasonable effort to seek credit from other sources

23

available under sections 364(a) and (b). *See Snowshoe*, 789 F.2d at 1088; *see also In re Utah 7000, L.L.C.*, No. 08-21869, 2008 WL 2654919, at *2 (Bankr. D. Utah July 3, 2008); *Shaw Indus., Inc v. First Nat'l Bank of PA (In re Shaw Indus., Inc.)*, 300 B.R. 861, 865 (Bankr. W.D. Pa. 2003) (where debtor made efforts by contacting "numerous" lenders and was unable to obtain credit without a priming lien, it had met its burden under Bankruptcy Code section 364(d)); *In re Plabell Rubber Prods., Inc.*, 137 B.R. 897, 899-900 (Bankr. N.D. Ohio 1992).

45.     Though the current market for financing may be improving, it is still strained as the global economy recovers from the recent credit crisis.  Simply put, because of current economic conditions, there is a limited market for financing, including debtor in possession financing or otherwise and provisions once considered "extraordinary" in debtor in possession financing arrangements have, for the time being, become standard. *See, e.g.*, Tr. of Rec., *Lyondell*, at 740:4-6 & 752-53:22 ("[B]y reason of present market conditions, as disappointing as the [DIP] pricing terms are, I find the provisions [of a DIP that included a roll-up of pre-petition secured debt] reasonable here and now."); Tr. of Rec. 123:17-25, 123:1, *Chemtura*, No. 09-11233 (S.D.N.Y. Mar. 20, 2009) (J. Gonzalez noting support for finding that DIP with roll-up provision was the only funding available to meet the debtors' needs at that time).

46.     Nevertheless, the February Debtors and the Guarantor believe that the terms that they have negotiated in the DIP Financing are favorable, fair and appropriate.  As an overall matter, the DIP Financing is part of a comprehensive transaction, which includes a commitment for an exit strategy.  Accordingly, the February Debtors and the Guarantor submit that the terms of the DIP Agreement provide financing on more favorable terms than any other reasonably available alternative.

**D.    The Terms of the DIP Financing Are Fair, Reasonable and Appropriate in Light of the February Debtors' Needs and the Current Market Environment**

47.    In considering whether the terms of post-petition financing are fair and reasonable, courts consider the terms in light of the relative circumstances of both the debtor and the potential lender. *See In re Farmland*, 294 B.R. at 886; *see also Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Trust Co. (In re Elingsen MacLean Oil Co., Inc.)*, 65 B.R. 358, 365 n.7 (W.D. Mich. 1986) (recognizing a debtor may have to enter into hard bargains to acquire funds for its reorganization).

*(i)    The Scope of the Carve-Out Is Appropriate*

48.    The proposed DIP Financing subjects the security interests and administrative expense claims of the DIP Lender to the Carve-Out. Such carve-outs for professional fees have been found to be reasonable and necessary to ensure that a debtor's estate and any statutory committee can retain assistance from counsel. *See, e.g., In re Barbara K. Enters., Inc.*, 2008 WL 2439649, at *8 *citing Ames*, 115 B.R. at 37 (pointing out reservations to DIP financing proposal with no carve-out for professional fees). The DIP Financing does not directly or indirectly deprive the February Debtors' estates or other parties in interest of possible rights and powers by restricting the services for which professionals may be paid in these cases. *See Ames*, 115 B.R. at 38 (observing that courts insist on carve-outs for professionals representing parties-in-interest because "[a]bsent such protection, the collective rights and expectations of all parties-in-interest are sorely prejudiced"). Additionally, the Carve-Out protects against administrative insolvency during the course of the case by ensuring that adequate assets remain for the payment of U.S. Trustee fees, Chapter 7 Trustee Fees and professional fees notwithstanding the grant of superpriority and administrative liens and claims under the DIP Financing.

*(ii)*     *The Payment of Fees to the DIP Lender Is Appropriate*

49.     The various fees and charges to be paid to the DIP Lender, as described in the overview of the proposed DIP Financing and provided for in the Commitment Letter, are reasonable and appropriate under the circumstances. Courts routinely authorize similar lender incentives beyond the explicit liens and rights specified in Bankruptcy Code section 364. *See Resolution Trust Corp. v. Official Unsecured Creditors Comm. (In re Defender Drug Stores, Inc.)*, 145 B.R. 312, 319 (B.A.P. 9th Cir. 1992) (approving financing facility pursuant to Bankruptcy Code section 364 that included a lender "enhancement fee"). More specifically, the February Debtors believe that the proposed interest rate is fair, reasonable and appropriate in light of the circumstances of these cases.

E.     **The Use of Cash Collateral Is Appropriate**

50.     Pursuant to Bankruptcy Code section 363(c), the February Debtors may only use cash collateral subject to the consent of those parties or the grant of adequate protection. The February Debtors do not believe that any Prior Liens are in existence as of the February Petition Date, the Colbeck Collateral does not include any Cash Collateral and the Bridge Loan Lenders have consented to the use of Cash Collateral.

51.     Further, the February Debtors submit that the Bridge Loan Lenders and Colbeck have been adequately protected. What constitutes adequate protection is decided on a case by case basis and adequate protection can come in various forms, including payment of adequate protection fees, payment of interest, granting of replacement liens and administrative claims. *See In re Mosello*, 195 B.R. 277, 289 (Bankr. S.D.N.Y. 1996) ("the determination of adequate protection is a fact specific inquiry . . . 'left to the vagaries of each case'") (citation omitted); *In re Realty Sw. Assocs.*, 140 B.R. 360, 366 (Bankr. S.D.N.Y. 1992); *In re Beker Indus. Corp.*, 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986) (the application of adequate protection "is left to the

vagaries of each case, but its focus is protection of the secured creditor from diminution in the value of its collateral during the reorganization process") (citation omitted); *Suntrust Bank v. Den-Mark Constr., Inc.*, 406 B.R. 683, 694 (E.D.N.C. 2009) (the concept of adequate protection is "susceptible to differing applications over a wide range of factual situations"). The Bridge Loan Lenders and Colbeck are adequately protected as the value of the February Debtors' assets greatly exceeds the amount of secured debt encumbering such assets.

52.     As further adequate protection, and to compensate the Bridge Loan Lenders for any diminution in value of their pre-petition collateral, the February Debtors propose to provide the Bridge Loan Lenders with the following (collectively, the *"Adequate Protection Obligations"*):

(a)     *Adequate Protection Lien.* As security for the payment of the Adequate Protection Obligations with respect to the Bridge Loan, the Bridge Loan Lenders are hereby granted (effective and perfected upon the date of the Order and without the necessity of the execution by the February Debtors of security agreements, pledge agreements, mortgages, financing statements or other agreements) a valid, perfected replacement security interest in and lien on the DIP Collateral (the *"Adequate Protection Lien"*), subject and subordinate only to (a) the Prior Liens; (b) the DIP Liens and (c) the Carve-Out.

(b)     *Interest.* The February Debtors shall, on the last day of each calendar month commencing after the closing of the DIP Financing, pay to the Bridge Loan Agent for prompt distribution to the Bridge Loan Lenders the interest accruing at the default rate under the Bridge Loan Agreement.

(c)     *Section 507(b) Claims.* The Adequate Protection Obligations shall constitute superpriority claims as provided in Bankruptcy Code section 507(b) (the *"507(b) Claims"*), with priority in payment over any and all administrative expenses of the kinds specified or ordered pursuant to any provision of the Bankruptcy Code, including without limitation, Bankruptcy Code sections 326, 328, 330, 331, 503(b), 506(c), 507(a), 726, 1113 and 1114, subject and subordinate only to (i) the Carve-Out and (ii) the Superpriority Claims granted in respect of the DIP Obligations. Except to the extent expressly set forth in the Order, the Bridge Loan Lenders shall not receive or retain any payments, property or other amounts in respect of the 507(b) Claims unless and until all DIP Obligations shall have indefeasibly been paid in full in cash and the commitments under the DIP Documents have been terminated.

(d) *Fees and Expenses.* The agent under the Bridge Loan and each Bridge Loan Lender shall receive from the TSC Debtors reimbursement of all reasonable, actual and documented fees and expenses incurred or accrued by such parties under and pursuant to the Bridge Loan, including, without limitation, the reasonable, actual and documented fees and disbursements of counsel to the agent under the Bridge Loan and each Bridge Loan Lender, whether incurred or accrued prior to or after the Petition Date.

(e) *Right to Credit Bid.* The Bridge Loan Agent (on behalf of the Bridge Loan Lenders) and the DIP Agent (on behalf of the DIP Lenders) shall have the right to "credit bid" the allowed amount of the obligations under the Bridge Loan and/or the DIP Financing, as applicable, during any sale or any of the TSC Debtors' assets pledged as Bridge Loan Collateral or DIP Collateral, as applicable, including without limitation, in connection with sales occurring pursuant to Bankruptcy Code section 363 or included as part of any chapter 11 plan of the TSC Debtors.

(f) *Information.* The February Debtors shall promptly provide to the Bridge Loan Agent any written notices, financial information or periodic report, including any budgets and variance reports, that is provided to, or required to be provided to, the DIP Agent or the DIP Lender. The February Debtors shall also give the Bridge Loan Agent reasonable access during normal business hours to the TSC Debtors' books and records, and the TSC Debtors shall respond to reasonable inquiries from the Bridge Loan Agent related to the TSC Debtors' books and records and operations.

53. The February Debtors believe that the proposed adequate protection is necessary and appropriate to ensure that the TSC Debtors can continue to use the cash collateral and access liquidity under the DIP Financing. Accordingly, the adequate protection proposed herein is fair and reasonable and is sufficient to satisfy the requirements of Bankruptcy Code sections 363(c) and 364(d).

## IX.   THE DIP FINANCING WAS NEGOTIATED IN GOOD FAITH AND SHOULD BE AFFORDED THE PROTECTION OF BANKRUPTCY CODE SECTION 364(E)

54. Bankruptcy Code section 364(e) protects a good faith lender's right to collect on loans extended to a debtor and its right in any lien securing those loans, even if the authority of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal. Specifically, Bankruptcy Code section 364(e) provides that any "reversal or modification on

appeal of an authorization to obtain credit or incur debt or a grant of priority or a lien under Bankruptcy Code section 364 shall not affect the validity of that debt incurred or priority or lien granted as long as the entity that extended credit "extended such credit in good faith." 11 U.S.C. § 364(e).

55.     Courts generally hold that "good faith" in the context of post-petition financing means, consistent with the Uniform Commercial Code, honesty in fact in the conduct or transaction concerned. *See Unsecured Creditors' Comm. v. First Nat'l Bank & Trust Co. (In re Ellingsen MacLean Oil Co.)*, 834 F.2d 599, 605 (6th Cir. 1987) (citing U.C.C. § 1-201(19)). Additionally, good faith is measured with respect to the good faith of the lender as contrasted to that of the borrower. Tr. of Rec. at 736:24-25, *In re Lyondell Chem. Co.*, No. 09-10023 (Bankr. S.D.N.Y. Feb. 27, 2009). Moreover, a lender's desire to ensure that it is repaid, to make money on interest and fees and to protect pre-petition positions are understandable and acceptable motivations for a post-petition lender in negotiating a deal. *Id.* at 737:10-14.

56.     As explained in detail herein, the terms of the DIP Financing were negotiated in good faith and at arm's length between the February Debtors, the Guarantor, the DIP Agent and the DIP Lender and all of the DIP Financing obligations will be extended by the DIP Lender in good faith (as such term is used in Bankruptcy Code section 364(e)). No consideration is being provided to any party to, or guarantor of, obligations arising under the DIP Financing, other than as set forth herein. Moreover, the DIP Financing has been extended in express reliance upon the protections offered by Bankruptcy Code section 364(e), and the DIP Lender should be entitled to the full protection of Bankruptcy Code section 364(e) in the event that the Order or any provision thereof is vacated, reversed or modified on appeal or otherwise.

## X. MODIFICATION OF THE AUTOMATIC STAY PROVIDED UNDER BANKRUPTCY CODE SECTION 362 IS APPROPRIATE UNDER THE CIRCUMSTANCES

57. Paragraph 8 of the proposed Order provides that the automatic stay imposed under Bankruptcy Code section 362(a) is hereby lifted to, among other things, (i) permit the February Debtors to grant various superpriority liens and claims, perform various obligations, incur various liabilities, (ii) permit the exercise of remedies by the DIP Agent and DIP Lender following a default under the DIP Financing and (iii) to allow the DIP Agent and the DIP Lender to file and record financing statements, mortgages or other instruments to provide notice and evidence the grant and perfection of the liens.

58. Stay modification provisions of this sort are ordinary and usual features of debtor in possession financing facilities and, in the February Debtors' business judgment, are reasonable under the present circumstances. *See, e.g., In re Innkeepers USA Trust*, Case No. 10-13800, at 14 (Bankr. S.D.N.Y. Sept. 2, 2010); *Tronox Inc.,* Case No. 09-10156, at 33, 41-43 (Bankr. S.D.N.Y. Jan. 15, 2010); *In re Gen. Growth Props. Inc.*, Case No. 09-1197, at 27, 30 (Bankr. S.D.N.Y. May 14, 2009); *In re Chemtura Corp.*, Case No. 09-11233, at 16-17 (Bankr. S.D.N.Y. Apr. 29, 2009). Accordingly, the Court should modify the automatic stay to the extent contemplated under the DIP Agreement and the proposed Order.

## XI. REQUEST FOR WAIVER OF STAY

59. The February Debtors and the Guarantor further seek a waiver of any stay of the effectiveness of the order approving this motion. Pursuant to Bankruptcy Rule 6004(h), "a[n] order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of fourteen (14) days after entry of the order, unless the court orders otherwise." As set forth above, the DIP Financing is essential to prevent irreparable damage to the February Debtors' business, value and ability to reorganize. Accordingly, the February Debtors and the

Guarantor submit that ample cause exists to justify a waiver of the 14-day stay imposed by Bankruptcy Rule 6004(h), to the extent it applies.

## XII. JURISDICTION

60.    Pursuant to 28 U.S.C. §§ 157 and 1334 and Standing Order M-61 of the United States District Court for the Southern District of New York, dated July 10, 1984 (Ward, Acting C.J.), the Court has jurisdiction to consider and grant the relief requested herein. A proceeding to consider and grant such relief is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## XIII. MOTION PRACTICE

61.    The DIP Motion includes citations to the applicable rules and statutory authorities upon which the relief requested herein is predicated, and a discussion of their application to this motion. Moreover, in addition to all entities otherwise entitled to receive notice, the February Debtors and the Guarantor have given notice of this motion to all entities believed to have or be claiming an interest in the subject matter of the proposed order or who, it is believed, otherwise would be affected by the proposed order. Accordingly, the February Debtors and the Guarantor submit that this motion satisfies Local Rule 9013-1.

## XIV. NOTICE

62.    The February Debtors and the Guarantor have provided notice of this DIP Motion to: (a) the Office of the United States Trustee for the Southern District of New York; (b) the entities listed on the Consolidated List of Creditors Holding the 30 Largest Unsecured Claims filed pursuant to Bankruptcy Rule 1007(d); (c) NexBank, SSB as agent for the Bridge Loan Lenders; (d) Weil, Gotshal & Manges LLP as counsel to Harbinger Capital Partners LLC and certain of its managed and affiliated funds; (e) Wachtell, Lipton, Rosen & Katz as counsel to Highland Capital Management, L.P. and certain of its managed and affiliated funds; (f) Quinn

31

Emanuel Urquhart & Sullivan, LLP as counsel to Solus Alternative Asset Management LP; (g) the DIP Agent; (h) Quinn Emanuel Urquhart & Sullivan, LLP as counsel to the DIP Agent; (i) Schulte Roth & Zabel LLP as counsel to Colbeck Capital Management, LLC; (j) the Internal Revenue Service; (k) the Securities and Exchange Commission; (l) the United States Attorney for the Southern District of New York; and (m) the Federal Communications Commission. In light of the nature of the relief requested, the February Debtors and the Guarantor respectfully submit that no further notice is necessary.

## XV.   NO PRIOR REQUEST

63.     No prior motion for the relief requested herein has been made to this or any other court.

WHEREFORE the February Debtors and the Guarantor respectfully request entry of orders, substantially similar to the proposed form of order attached hereto as Exhibit A, granting the relief requested herein and such other and further relief as the Court may deem just and appropriate.

New York, New York
Dated: February 16, 2011

/s/ Ira S. Dizengoff
AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
(212) 872-1000 (Telephone)
(212) 872-1002 (Facsimile)
Ira S. Dizengoff
Arik Preis

1700 Pacific Avenue, Suite 4100
Dallas, Texas 75201
(214) 969-2800 (Telephone)
(214) 969-4343 (Facsimile)
Sarah Link Schultz

*Counsel to the Other TSC Debtors and
Proposed Counsel to the February Debtors*